# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br><br>PAMELA QU,<br>a.k.a. Minhong Qu, a.k.a. "Sophia," and<br>a.k.a. "Sophia Qu." | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>09- **09 - 1801M** |

Complaint for violations of Title 18, United States Code, Section 2320 (Trafficking in Counterfeit Goods and Services) and Title 21, United States Code, Sections 331(i)(3) and 333(a)(1) (Sale of Counterfeit Drugs)

| NAME OF MAGISTRATE JUDGE<br>HONORABLE VICTOR B. KENTON | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE<br>Date unknown through August 14, 2009 | PLACE OF OFFENSE<br>Los Angeles County, California | ADDRESS OF ACCUSED (IF KNOWN)<br>FILED<br>CLERK, U.S. DISTRICT COURT<br>AUG 14 2009<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY _____ DEPUTY |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Beginning on or about an unknown date, and continuing through August 14, 2009, in Los Angeles County, within the Central District of California, defendant PAMELA QU, also known as ("a.k.a.") "Minhong Qu," a.k.a. "Sophia," and a.k.a. "Sophia Qu," intentionally trafficked and attempted to traffic in goods and knowingly used a counterfeit mark on and in connection with such goods, knowing that a counterfeit mark had been applied thereto, the use of which was likely to cause confusion, to cause mistake, and to deceive, in violation of Title 18, United States Code, Section 2320.

Beginning on or about an unknown date, and continuing through August 14, 2009, in Los Angeles County, within the Central District of California, defendant PAMELA QU, a.k.a. "Minhong Qu," a.k.a. "Sophia," and a.k.a. "Sophia Qu," did an act which causes a drug to be a counterfeit drug, and sold and dispensed, and held for sale and dispensing, a counterfeit drug, in violation of Title 21, United States Code, Sections 331(i)(3) and 333(a)(1).

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See supporting affidavit)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>*Aaron Lindaman*<br>AARON G. LINDAMAN |
|---|---|
| | OFFICIAL TITLE<br>SPECIAL AGENT, DEPARTMENT OF HOMELAND SECURITY, U.S. IMMIGRATION AND CUSTOMS ENFORCEMENT |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br>August 14, 2009 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

AUSA: Harvinder S. Anand      REC: Detention

(HSA)

## A F F I D A V I T

I, Aaron G. Lindaman, being duly sworn, hereby depose and say:

### I.

### INTRODUCTION

1.    I am a Special Agent ("SA") with the Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), presently assigned to the Office of the Special Agent in Charge Los Angeles ("SAC/LA"), California.  I have been so employed since December 1, 2007.  I am currently assigned to the SAC/LA Intellectual Property Rights ("IPR") Group, investigating commercial smuggling, fraud and IPR violations committed against the United States.  I have participated in numerous fraud and IPR-related investigations in the Central District of California.

2.    I have received 22 weeks of training at the Federal Law Enforcement Training Center in Brunswick, Georgia.  This training program included topics in detecting and investigating violations of various federal laws, including fraud and IPR violations.  Prior to this position, I was an Officer for five years with the United States Border Patrol, stationed in Calexico, California. For this position, I received 26 weeks of training at the

Federal Law Enforcement Academy in Charleston, South
Carolina. The training program included topics in basic
law enforcement duties and techniques, basic border
patrolling and tracking techniques, immigration law and
application, and basic law enforcement Spanish.

3. The information contained in this affidavit is
based on my personal observations, witness interviews,
conversations with ICE investigators and agents and other
agencies involved in this investigation, and my review of
documents obtained during this investigation. This
affidavit does not purport to set forth all of my knowledge
of, or investigation into, this matter. Where
conversations and events are referred to herein, they are
related in substance and in part. Where figures and
calculations are set forth, they are approximate. I have
only set forth the facts that I feel are necessary to
establish probable cause for the requested criminal
complaints, arrest warrants and search warrant.

II.

## PURPOSE OF AFFIDAVIT

4. This affidavit is made in support of criminal
complaints against and arrest warrants for (1) **PAMELA QU**,[1]

---

[1] **PAMELA QU's** legal name previously was **MINHONG QU**.
Based on my review of **QU's** Alien File (A# XXXXXX010), I

-2-

also known as ("a.k.a.") "**MINHONG QU**," a.k.a. "Sophia," and

a.k.a. "Sophia Qu," for violations of Title 18, United

States Code, Section 2320 (Trafficking in Counterfeit Goods

and Services), and Title 21, United States Code, Sections

331(i)(3) and 333(a)(1) (Sale of Counterfeit Drugs); and

(2) **QU's** sister, **TOSHIE ISHIKAWA**, a.k.a. "Sharry," and

a.k.a. "Sharry Ishikawa," for a violation of Title 21,

United States Code, Sections 331(i)(3) and 333(a)(1) (Sale

of Counterfeit Drugs).

    5.    This affidavit is also made in support of an

application for authorization to search the residence

located at 245 South California Street, San Gabriel,

California 91176 (the "**SUBJECT PREMISES**") for violations of

(1) 18 U.S.C. § 2320 (Trafficking in Counterfeit Goods and

Services); (2) 21 U.S.C. §§ 331(i)(3) and 333(a)(1) (Sale

of Counterfeit Drugs); (3) 21 U.S.C. §§ 331(t),

---

know that **QU** filed a petition in September 2008 to change
her name from **MINHONG QU** to **PAMELA QU**.  On or about October
9, 2008, **QU** received a Certificate of Naturalization under
the name **PAMELA QU**.  On August 13, 2009, Special Agent
Jason DeFreitas accessed the California Department of Motor
Vehicle photo identification system and determined that
when **QU** applied to renew her driver's license, **QU** used the
first name **PAMELA**.  Although it appears that **QU's** true
first name is **PAMELA**, most of this investigation involved
receiving identifying information when **QU's** first name was
**MINHONG**.  Accordingly, in most places in this affidavit, I
will refer to **QU's** first name as **MINHONG**.

353(e)(2)(A), and 333(b)(1)(D) (Wholesale Distribution of
Prescription Drugs without a License); (4) 18 U.S.C.
§ 2421 (Interstate Transportation for Illegal Sexual
Activity); and (5) 18 U.S.C. § 2422 (Coercion and
Enticement to Travel Interstate to Engage in Sexual
Activity).

### III.

### PREMISES TO BE SEARCHED

6.    This application seeks authorization to search
the premises located at 245 South California Street, San
Gabriel, California 91176 (the "**SUBJECT PREMISES**").   The
**SUBJECT PREMISES** is a two-story Spanish or Mediterranean
style house located on the west side of California Street.
The **SUBJECT PREMISES** has an orange colored stucco exterior
and a red tiled roof.   The **SUBJECT PREMISES** has a long
concrete driveway that extends from California Street
through to the back yard of the premises.   The **SUBJECT
PREMISES** has a wrought-iron gate, which separates the front
driveway from the rear drive.   This gate is framed into an
archway on the first story of the **SUBJECT PREMISES**.   The
**SUBJECT PREMISES** has two large French-style windows on the
second story, which face California Street.

-4-

IV.

## STATEMENT OF PROBABLE CAUSE

### A.    Summary of the Investigation

7.    In October 2008, I received information from a Cooperating Defendant (the "CD") that a woman named "Sophia," later determined to be **MINHONG QU**, was selling suspected counterfeit VIAGRA® pills and was operating a prostitution business from her home.  The CD had purchased one purported pill of VIAGRA® from "Sophia" for $10 before he started to provide me with information in this investigation.  I later had that pill tested by Pfizer Inc., the manufacturer of VIAGRA® pills.  Pfizer determined to pill to be counterfeit.

8.    After **QU** sold the CD the counterfeit VIAGRA® pill, she also told the CD about a business that she runs out of her home (the **SUBJECT PREMISES**).  **QU** told the CD that she had girls[2] available for between $200 and $250.  It was apparent from the context of **QU's** statements that she was running a prostitution business.  **QU** also told the CD about a website (www.lafuzuko.com) through which she was

---

[2]    When **QU** spoke to the CD and UCA, she used terms in Japanese and Chinese that can be interpreted as "girls." The term that **QU** used with UCA can also be mean "ladies." I will use the word "girls" throughout this affidavit. There is no evidence, however, that any of the prostitutes referred to in this investigation are underage.

offering girls' services for sale.  The www.lafuzuko.com website is written in Japanese and appears to cater primarily to Asian customers.  Investigation in this case has revealed that **QU** is running a prostitution business that includes **QU** sending women, most of whom are of Asian descent, to Las Vegas, Nevada.

9.  The CD introduced an undercover agent with the Immigration and Customs Enforcement to **QU**.  During the introductory meeting, the CD and undercover agent (the "UCA") together purchased two bottles containing purported pills of VIAGRA® from **QU** for $460; those pills later were also determined to be counterfeit.  In subsequent meetings, **QU** has sold the UCA a total of six bottles of purported VIAGRA®, five of which have been confirmed to be counterfeit (the contents of the bottle that **QU** sold most recently has not been analyzed yet).  **TOSHIE ISHIKAWA**, who lives with and is **QU's** sister, sold the UCA one bottle of counterfeit VIAGRA® in July 2009.

10.  During the first sale of counterfeit VIAGRA® pills to the UCA, **QU** told the UCA about her business of offering girls' services for sale, i.e., her prostitution business.  During subsequent meetings, the UCA asked **QU** whether she could send prostitutes to Las Vegas to meet with him and his business associates.  **QU** agreed.  The UCA

-6-

has paid **QU** a $2,000 down payment in anticipation of providing these services on August 17, 2009.  **QU** is scheduled to drive four prostitutes to Las Vegas on that day to meet with the UCA and his business associates in a hotel.

**B.   Pfizer Inc. Manufactures and Has Live Trademarks for VIAGRA®**

11.   On July 29, 2009, I queried the United States Patent & Trademark ("USPTO") Internet website and learned the following information regarding Pfizer Inc.'s registered trademarks:

a.   Pfizer Inc. ("Pfizer") has registered the following trademark relating to VIAGRA® (registration number 2593407) with the United States Patent and Trademark Office ("USPTO"):



The registration statement provided:  "The mark consists of a diamond-shaped dosage tablet, combined with the color blue as applied on the entire surface of the goods."  It was registered on July 16, 2002, and is a live trademark.

-7-

b.    Pfizer also has registered with the USPTO the following mark as registration number 3,125,531 in connection with pharmaceutical preparations:



It was registered on August 24, 1948, and is a live trademark.

c.    Pfizer has registered the mark "VGR" (registration number 2827922) with the USPTO to appear on erectile dysfunction medications.  It was registered on March 30, 2004, and is a live trademark.

d.    Pfizer has registered the mark "VIAGRA®" (registration number 2162548) with the USPTO.  It was registered on June 02, 1998, and is a live trademark.

C.  **A Cooperating Defendant Provided Information About a Woman Named "Sophia" Selling Purported VIAGRA® Pills and Running a Prostitution Business at the SUBJECT PREMISES**

12.    On or about October 20 and 21, 2008, a Cooperating Defendant ("CD")[3] provided me the following

---

[3]    At the time the Cooperating Defendant provided the information to me, he had pleaded guilty to a federal offense, but had not been sentenced.  Subsequently, the Cooperating Defendant received consideration for his cooperation in this case and received a non-custodial sentence.

-8-

information regarding a woman named "Sophia," later
identified to be **MINHONG QU**:

      a.    On or about October 20, 2008, the CD called
phone number XXX-XXX-5717 and spoke with a woman named
"Sophia" in Japanese about purchasing VIAGRA® pills.
"Sophia" instructed the CD to go to her residence, i.e.,
the **SUBJECT PREMISES**, to purchase the VIAGRA® pills.

      b.    On or about October 20, 2008, the CD drove
to the **SUBJECT PREMISES**, where he met with the woman who
called herself "Sophia." "Sophia" invited the CD into the
**SUBJECT PREMESIS**, where the CD purchased a single blue
tablet of purported VIAGRA® from "Sophia" for $10.

      c.    After the CD purchased the tablet of
purported VIAGRA®, he asked "Sophia" if she did any other
things. In response, "Sophia" stated that in addition to
selling VIAGRA®, her main business was operating what the
CD described as a prostitution business from her residence,
i.e., the **SUBJECT PREMISES**. "Sophia" stated that she
charges approximately $200 to have sex with a girl at her
house.[4]  "Sophia" stated that she charges $250 to have sex

---

    [4]   Although "Sophia" did not use the word "sex" during
the conversation with the CD, it was apparent from the
context of their conversation that "Sophia" was referring
to girls having sex with customers.

with a girl away from her residence. "Sophia" also told the CD that "sometimes the customer[s] need VIAGRA®."

d. "Sophia" told the CD that she has Japanese and Korean girls available for prostitution and that she charges $150 for a Korean girl at her residence and $200 for a Japanese girl at her residence.

e. "Sophia" told the CD about a website known as "www.lafuzuko.com." The CD understood this website to promote "Sophia's" prostitution business.

f. "Sophia" told the CD that she could supply the CD with VIAGRA® by the bottle (one bottle of VIAGRA® contains 30 tablets). "Sophia" stated she could ship the VIAGRA® to other countries, such as Japan, if necessary.

g. The CD described "Sophia" as a Chinese woman[5] in her mid- to late-40's who spoke Japanese very well, the language in which he communicated with "Sophia" on October 20, 2008. "Sophia" told the CD that her last name was "Que" or "Kuo" (phonetic). As discussed later below, "Sophia" was later identified as **MINHONG QU**.

### D. QU and ISHIKAWA Reside at the SUBJECT PREMISES

13. On or about October 20, 2008, I conducted open source checks through the law enforcement database

---

[5]     Based on my review of **QU's** Alien File (A# XXXXXX010), I know that **QU** was born in Shanghai, China.

-10-

"www.accurint.com" for information about individuals living or residing at the **SUBJECT PREMISES**. From this database, I learned that a woman named **MINHONG QU**, date of birth ("DOB") XX/XX/1968, was listed as residing at the **SUBJECT PREMISES**. I also learned through "www.accurint.com" that **TOSHIE ISHIKAWA** (DOB: unknown) was listed as having resided at the **SUBJECT PREMISES** from February 2006 to June 2008.

14. On or about November 21, 2008, Southern California Edison ("SCE") provided me with subscriber information that showed that **MINHONG QU** is the utility customer at the **SUBJECT PREMISES**. Additionally, according to the records I received from SCE, **QU** listed **TOSHIE ISHIKAWA** as her sister and listed XXX-XXX-1143 (home phone) and XXX-XXX-5717 as her contact phone numbers. As further discussed below, these are the same two phone numbers that are listed as the contact phone numbers at the website www.lafuzoku.com, the website address that **QU** provided to the CD on October 20, 2008.

15. On or about December 2, 2008, I queried the U.S. Immigration and Customs Enforcement's Student and Exchange Visitor Information System ("SEVIS") for information about **TOSHIE ISHIKAWA**. From this search, I learned that **ISHIKAWA** is currently in the United States on an F-1 (Student) Non-

-11-

immigrant Visa.[6]  According to the SEVIS database, **ISHIKAWA** lists the **SUBJECT PREMISES** as her residence in the United States.

16.  As further discussed below, an undercover agent with ICE has met with **QU** and **ISHIKAWA** at the **SUBJECT PREMISES,** where **QU** and **ISHIKAWA** continue to reside.

**E.   The Cooperating Defendant Identified "Sophia" as QU**

17.  On or about October 20, 2008, I searched the Treasury Enforcement Communications System ("TECS") for information about **MINHONG QU** (DOB: XX/XX/1968).  I learned that on or around March 15, 2006, **QU** deposited over \$12,000 into a Washington Mutual Bank account using driver's license number XXXXX745.

18.  On or about October 20, 2008, I searched the California State Driver's License Database ("CALPHOTO"). Using driver's license number XXXXX745 (the above license number), I found a driver's license photo for **MINHONG QU**. On or about October 21, 2008, I showed this photo to the CD.  The CD positively identified the woman in the photo as "Sophia," the woman he met at the **SUBJECT PREMISES** on October 20, 2008.

---

[6]    If **ISHIKAWA** is found to have committed a crime, she may be subject to removal from the United States for violating the terms of her F-1 Visa.  Accordingly, I will seek permission below to search for documents relating to **ISHIKAWA's** F-1 Visa.

-12-

**F.    The Pill that QU Sold to the Cooperating Defendant on October 20, 2008 Was Counterfeit VIAGRA®**

19.    On or about October 21, 2008, I took custody of and examined the tablet of purported VIAGRA® that "Sophia" had sold to the CD on October 20, 2008.  The tablet appeared to be legitimate VIAGRA® manufactured by Pfizer. It was a blue, diamond-shaped tablet stamped on one side with the Pfizer logo.  The other side of the tablet was stamped with the logo "VGR 100."  From my training and experience, and based on conversations with other ICE Agents, I know that, on a legitimate VIAGRA® pill, the logo "VGR 100" means that the pill contains 100 mg of "sildenafil citrate," the active ingredient in VIAGRA®.

20.    On or about November 2, 2008, I sent the tablet that "Sophia" had sold to the CD to Pfizer's laboratory for scientific analysis.

21.    On or about November 5, 2008, Pfizer's Intellectual Property Forensic Laboratories confirmed that the purported VIAGRA® pill that QU sold to the CD on October 20, 2008, was counterfeit.

**G.    The Website www.lafuzoku.com Offers Reservations with Girls and Lists QU's Phone Numbers**

22.    On or about October 22, 2008, based on the information I received from the CD, I queried the Internet

-13-

search engine www.google.com for the key phrase "www.lafuzoku.com." As a result of this open source search, I learned the following:

a. My www.google.com query resulted in a hyperlink for the website www.lafuzoku.com. I clicked on this hyperlink, and was taken to a webpage that appeared to be written in Japanese.

b. Utilizing the "Translate this Page" feature provided by www.google.com, I translated the www.lafuzoku.com webpage from Japanese to English. After translating this page, I saw that www.lafuzoku.com is a website that appears to promote prostitution services in the Los Angeles, California area. Upon browsing this website, I saw pictures of approximately ten women dressed in lingerie or night gowns with their faces hidden or eyes redacted.

c. Under the heading "A reservation" I saw two phone numbers -- XXX-XXX-5717 and XXX-XXX-1143 -- and the words "Megumi feel free to call us now, please." Beneath these two phone numbers, I saw the words "Reservation hours, Morning 11am-midnight to 1am." Additionally, while browsing this website, I saw a heading titled, "How Request Service" with the following information:

(1) by phone, and set a time of hope

-14-

(2) staff arrived in the shortest 20 minutes
(3) consult your health
(4) or less of service time is optional.

- 1 hour course
- 2 hours
- 4 hours
- 6 hours

Others "1 Day", "accompanied the course of your trip", "accompanied tour in Las Vegas," is also available. By phone, please ask for details.

(5) In the case of an extension, please call us at.

© Copyright 2005-2007 LA Fuzoku.com All Rights Reserved

23. The two phone numbers listed on www.lafuzoku.com -- XXX-XXX-5717 and XXX-XXX-1143 -- are the same phone numbers that QU provided to Southern California Edison as her contact numbers. Furthermore, one of the phone numbers -- XXX-XXX-5717 -- is the same phone number that the CD called when he spoke to QU on October 20, 2008.

24. On or about July 29, 2009, I again queried the search engine www.google.com for the keyword www.lafuzoku.com. The search result again took me to a hyperlink for www.lafuzoku.com. Utilizing the "Translate this Page" feature, I was again able to view the www.lafuzoku.com webpage. The webpage is currently copyrighted through the year 2010; this, however, was the

-15-

only change I observed to the website www.lafuzoku.com

since I first viewed it on October 22, 2008.

## H.   QU Is the Registered Subscriber for the Phone Numbers Advertised on the Website www.lafuzoku.com

25.   On or about June 10, 2009, I received information

from AT&T stating that **MINHONG QU** (DOB XX/XX/1968) is the

registered subscriber for phone numbers XXX-XX-5717 and

XXX-XX-1143, the two phone numbers listed on

www.lafuzoku.com.

## I.   The Cooperating Defendant and an Undercover Agent Purchased Two Bottles of Counterfeit VIAGRA® from QU at the SUBJECT PREMISES in November 2008

26.   On or about November 26, 2008, an ICE Undercover

Agent (UCA) and the CD purchased two bottles of Viagra (60

pills) from **MINHONG QU** at the **SUBJECT PREMISES**.   The CD

arranged the meeting by calling **QU** on or about November 25,

2008.

27.   The UCA and CD met with QU at approximately 2:30

p.m. on November 26, 2008.   This meeting was recorded.

From my conversations with the UCA and based on my review

of an English transcript of the recorded meeting, I know

that:[7]

_____

[7]   Unless otherwise noted, all conversations and
consensually monitored meetings between and among **QU**,
**ISHIKAWA**, the UCA, the CD, or anyone else referred to in
this affidavit, were conducted primarily in Mandarin
Chinese or Japanese and translated for me by the person who

a. **QU** greeted the UCA and CD at the front door of the **SUBJECT PREMISES**.

b. **QU** let the UCA and the CD into the **SUBJECT PREMISES** and gave the UCA a brown sandwich bag containing two bottles of purported VIAGRA®. In return, the UCA gave **QU** $230 and the CD also gave **QU** $230.[8]

c. **QU** referred to herself as "Sophia" during the meeting.

28. From my conversations with the UCA and based on my review of an English transcript of the recorded meeting with **QU** on November 26, 2008, I also know that:

a. The UCA engaged **QU** in conversation about her prostitution business. **QU** stated that Japanese girls work for her. **QU** stated that she charges $200 for Japanese girls to meet a customer at her (**QU's**) residence. **QU** stated that she charges $250 for a customer to take a Japanese girl away from her home.

b. **QU** stated that she also has Chinese and Korean girls available, and that she charges $150 for forty minutes with a Chinese or Korean girl at her (**QU's**)

---

communicated with **QU** or **ISHIKAWA**.

[8] As further discussed below, **QU's** selling price is itself evidence of the purported VIAGRA® pills being counterfeit. **QU's** price for the bottle was equivalent to each pill costing $7.70, which is less than half the price for which a real pill of VIAGRA® typically sells.

residence.  QU stated that the Chinese and Korean girls usually stay at her home.

c.  QU told the UCA that she usually operates her business between the hours of 1:00 p.m. or 2:00 p.m. and midnight.

d.  QU told the UCA that she has been in this business for approximately 17 years.[9]

e.  QU told the UCA that many of the girls who work for her are students from Japan and China and that she has around seven or eight Japanese girls and many Chinese and Korean girls working for her.

f.  QU told the UCA that she also has local American and Hispanic girls working for her and that she charges $150 for a Hispanic girl.

_____

[9]    During the course of this investigation, I obtained QU's Alien File (A# XXXXXX010).  The file contains information that QU was cited for a prostitution charge in the City of San Gabriel, California in January 2003.  I have been informed by the San Gabriel Police Department that QU was not convicted for this charge and that the original police report for the charge has since been destroyed.  On or about December 4, 2008, I conducted a California employment history check for QU, utilizing the State of California Employment and Development Division ("EDD"), which keeps records of an individual's employment history for approximately the preceding 18 months.  EDD had no history of employment for MINHONG QU for the preceding 18 months in the state of California.  On or about August 13, 2009, I again conducted an employment check for QU with EDD.  EDD still has no history of employment for QU.

-18-

29.    From my conversations with the UCA and based on my review of an English transcript of the recorded meeting with **QU** on November 26, 2008, I also know that:

    a.    **QU** told the UCA that she always has VIAGRA® available at anytime.

    b.    The UCA asked **QU** how much time she would need to get the UCA five or ten bottles of VIAGRA®.   QU told the UCA that she would need one day's notice for such an order.

30.    The two bottles of purported VIAGRA® that **QU** sold to the UCA and CD on November 26, 2008, appeared to be manufactured by Pfizer.   The bottles had the Pfizer Inc. logo and a label purporting the pills to be 100 mg VIAGRA®. The bottles were sealed with a silver tamper-proof cover with the Pfizer logo.   Upon opening these bottles and breaking the tamper-proof seal, I found blue, diamond-shaped tablets stamped on one side with the Pfizer logo. The other side of the tablets were stamped "VGR 100."

31.    On or about December 8, 2008, I sent one bottle to Pfizer's laboratory for scientific analysis.[10]

---

[10]    The one bottle that I sent to Pfizer was a representative sample.   The two bottles that **QU** sold to the UCA and CD appeared to be identical.

32. On or about December 16, 2008, Pfizer's Intellectual Property Forensic Laboratories confirmed that the bottle I submitted contained counterfeit VIAGRA® pills.

## J. Results of Surveillance at the SUBJECT PREMISES in December 2008

33. On or about Monday, December 1, 2008, ICE Special Agents Wally Tsui and Mario Sampedro and I conducted surveillance at the **SUBJECT PREMISES**. We observed the following:

a. At approximately 4:00 p.m., I observed a green Honda Civic sedan parked in the driveway of the **SUBJECT PREMISES**. Through a law enforcement database, I determined that this vehicle is registered to **TOSHIE ISHIKAWA** and **MINHONG QU** at the **SUBJECT PREMISES**.

b. At approximately 4:50 p.m., I observed a white Lexus sedan park across the street from the **SUBJECT PREMISES**. We observed two Asian men exit from the white Lexus and enter the **SUBJECT PREMISES**.

c. At approximately 5:10 p.m., I observed a dark colored van park adjacent to the **SUBJECT PREMISES**. We observed a man exit this van and enter the **SUBJECT PREMISES**. At approximately 5:55 p.m., I observed the man exit the **SUBJECT PREMISES**. He was inside the **SUBJECT PREMISES** for approximately 45 minutes.

-20-

d.    At approximately 5:12 p.m., I observed a vehicle stop in front of the **SUBJECT PREMISES**.  We observed a young Asian woman exit the vehicle and enter the **SUBJECT PREMISES**.  The vehicle then drove away.

e.    At approximately 5:25 p.m., I observed another young Asian woman enter the **SUBJECT PREMISES** after she was dropped off by a vehicle.

f.    At approximately 5:30 p.m., SA Tsui observed a white BMW automobile pull into the driveway at the **SUBJECT PREMISES**.  This vehicle was parked in the driveway for approximately 25 minutes, after which time I observed the BMW drive away from the **SUBJECT PREMISES**.[11]

## K.    Results of Refuse Check at the SUBJECT PREMISES in December 2008

34.  On or about Tuesday, December 9, 2008, Special Agent Wally Tsui and I searched the trash left on the street in front of the **SUBJECT PREMISES**.  I seized the following items from the trash:

a.    Financial documents addressed to **QU**.

b.    Fourteen used latex condoms and accompanying condom packages.

---

[11]    In the afternoon of December 3, 2008, Special Agent Mario Sampedro and I conducted surveillance at the **SUBJECT PREMISES**.  We observed no unusual activity.  In the afternoon of December 11, 2008, three ICE agents and I conducted surveillance at the **SUBJECT PREMISES**.  We observed no unusual activity.

-21-

**L.** **The Undercover Agent Purchased Five Bottles of Counterfeit VIAGRA® from QU at the SUBJECT PREMISES in January 2009**

35. On January 22, 2009, the UCA purchased five bottles of counterfeit VIAGRA® from **QU** at the **SUBJECT PREMISES.** The meeting was arranged via a consensually monitored telephone call between the CD and **QU** on January 20, 2009. During this telephone call, **QU** agreed to sell the UCA five bottles of purported VIAGRA® for $220 per bottle ($1,100 total). From my conversations with the UCA and a review of the English transcript of the meeting between the UCA and **QU**, which was recorded, I learned the following:

a. On January 22, 2009, at approximately 3:00 p.m., the UCA entered the **SUBJECT PREMISES. QU** offered the UCA tea. The UCA accepted **QU's** offer. **QU** went to and returned from her kitchen. When she returned, **QU** served the UCA tea and handed him a brown sandwich bag containing five bottles of purported VIAGRA®. In exchange, the UCA paid **QU** $1,100.

b. The UCA spoke to **QU** about her prostitution business. The UCA told **QU** that he had heard the CD mention something about Las Vegas while talking to **QU. QU** told the UCA that to take a girl out of her home, she charges $250 for an hour, but to go to Las Vegas with a girl, she

-22-

charges $1,000 per day. QU told the UCA that she has sent girls to work in Las Vegas and that the customer usually buys the plane ticket for a girl to travel to and from Las Vegas.

c.    The UCA presented himself to QU as a businessman and expressed interest in QU sending girls to Las Vegas to meet with him and his business associates. QU stated that she was willing to send girls to Las Vegas to meet the UCA and his associates. QU stated that she would charge approximately $1,000 per day, for each girl, to meet customers in Las Vegas, Nevada. QU stated that typically transportation for the girls from San Gabriel, California to Las Vegas, Nevada would be paid for by the customer.

d.    QU told the UCA that Japanese girls would go to Las Vegas, Nevada with the UCA, but that Chinese girls would not be so agreeable, i.e., to go on a trip to Las Vegas, Nevada. QU later told the UCA, however, that although usually only Japanese girls go out of town to Las Vegas, if the UCA preferred Chinese girls in Las Vegas, this could be arranged. QU stated that it would not be a problem to have three, four, five or six ladies go with the UCA to Las Vegas.

36.    The five bottles of purported VIAGRA® that QU sold to the UCA on January 22, 2009, appeared to be

-23-

manufactured by Pfizer. The bottles had the Pfizer logo and a label stating that the pills were 100 mg VIAGRA®. The bottles were sealed with a silver tamper-proof cover with the Pfizer logo. Upon opening these bottles and breaking the tamper-proof seals, I found blue, diamond-shaped tablets stamped on one side with the Pfizer logo. The other side of the tablets were stamped "VGR 100."

37. On or about January 27, 2009, I sent one bottle, which was a representative sample of the five bottles, to Pfizer's laboratory for scientific analysis.

38. On or about February 3, 2009, Pfizer Inc. Intellectual Property Forensic Laboratories confirmed that the bottle that I sent for analysis contained counterfeit VIAGRA® pills.

## M.  Results of Surveillance at the SUBJECT PREMISES on February 12, 2009

39. On or about Thursday, February 12, 2009, ICE Special Agents and I conducted surveillance at the **SUBJECT PREMISES**. We observed the following:

a.  At approximately 6:00 p.m., I observed an Asian woman enter the **SUBJECT PREMISES** after she was dropped off by a vehicle.

b.  At approximately 7:30 p.m., I observed a silver color Toyota Camry park curbside near the **SUBJECT**

-24-

**PREMISES.** I observed a middle aged Asian man exit the vehicle and smoke a cigarette outside of his car. After approximately five minutes, I observed a young Asian woman walking southbound on South California Street from the direction of the **SUBJECT PREMISES.** The woman entered the silver Toyota Camry and the car drove off.

     c. At approximately 8:30 p.m., I observed the aforementioned Silver Toyota Camry return to the **SUBJECT PREMISES.** Due to low lighting conditions, I was unable to observe if the Toyota Camry dropped anyone off at the **SUBJECT PREMISES.** I briefly followed the silver Toyota Camry away from the **SUBJECT PREMISES** and observed only a single male driver in the vehicle.

## N. Results of Refuse Checks at the SUBJECT PREMISES in February and March 2009

40. On or about February 17, 2009, ICE Special Agent Joe Simms and I searched the trash left on the street in front of the **SUBJECT PREMISES.** I seized the following items:

     a. "Crown Condom 1,008 Latex Condoms Product Code #21000 Lot No. T 247. Okamoto USA Inc., Stratford Ct. 06615 USA."

     b. Fifteen used condoms with assorted wrappers.

c.    Miscellaneous documents addressed to **QU** at the **SUBJECT PREMISES**.

41.   On or about March 10, 2009, I searched the trash left on the street in front of the **SUBJECT PREMISES**.   I seized the following items:

a.    Fifteen assorted brand latex condom wrappers;

b.    Miscellaneous documents addressed to **QU** at the **SUBJECT PREMISES** and documents with **QU's** name on them.

c.    A generic birthday card from a company in Torrance, California addressed to "Ms. Sharry **ISHIKAWA**." The postcard had been mailed to a post office box address.

**O.   QU Informed Callers Inquiring About Her Website that She Would Send Prostitutes to Las Vegas, Nevada**

42.   On or about April 8, 2009, an undocumented source called XXX-XXX-5717, a phone number registered to **QU**, and spoke to a woman in Japanese.   The undocumented source is a native Japanese speaker and his conversation with the woman was entirely in Japanese.   Their conversation was recorded and heard by Special Agent Mario Sampedro.   Prior to placing the phone call, I showed the undocumented source the website www.lafuzoku.com and instructed the undocumented source to inquire whether girls were available to travel to Las Vegas, Nevada.   Based on my conversations

-26-

with the undocumented source following the phone call, I learned the following:

a. The undocumented source called the phone number XXX-XXX-5717. A woman answered the phone. The undocumented source told the woman that he saw her number advertised on the website www.lafuzoku.com and that he was interested in girls.

b. The woman stated that the price for Japanese girls is $250 per hour and that the Japanese girls could be sent to a customer's home. The woman also stated that the cost for Mexican girls is $150.

c. The woman told the undocumented source that she could send girls to meet with customers in Las Vegas, Nevada for a cost of $1,000 per girl. The woman stated that she would need to be contacted a couple of days in advance before the girls could go to Las Vegas. The woman also stated that because the girls are students, they would need a couple of days' advance notice to travel to Las Vegas.

43. On or about July 10, 2009, ICE Special Agent Bruce Kamei called XXX-XXX-5717, a phone number registered to QU, and spoke to a woman who eventually identified herself as "Sophia," an alias that QU uses. Based on my

-27-

conversations with SA Kamei regarding his conversation with "Sophia," I learned the following:

a. When SA Kamei called the phone number XXX-XXX-5717, a woman answered the phone. SA Kamei asked for "Megumi," a name associated with the phone number XXX-XXX-5717 at www.lafuzoku.com. SA Kamei asked for "Megumi" in English. The woman who answered the phone acknowledged SA Kamei in Japanese. Initially, the woman who answered the phone was hesitant to speak with SA Kamei. After approximately two minutes, SA Kamei engaged "Megumi" in conversation in Japanese. During the course of this conversation, SA Kamei told "Megumi" that he is interested in having a "party" in Las Vegas, Nevada around Thanksgiving of this year. "Megumi" agreed to accommodate SA Kamei, and asked how many girls SA Kamei would need for his "party." SA Kamei told "Megumi" that he would need 10 to 12 girls for his "party." "Megumi" responded, "that is going to cost you a fortune."

b. During the course of their conversation, "Megumi" told SA Kamei that it would cost approximately $1,000 per girl, per day for their services in Las Vegas, Nevada. SA Kamei agreed to this price, and asked "Megumi" if he could call her back later in the month. "Megumi" agreed to this and told SA Kamei to call her to set up the

proposed Las Vegas meeting a "couple of months ahead." Prior to ending their conversation, SA Kamei thanked "Megumi." In response, "Megumi" told SA Kamei that her name is not "Megumi" and to call her "Sophia." "Sophia" is a known alias that QU uses.

   c. On or about August 12, 2009, the UCA listened to the audio recordings from the aforementioned monitored calls and identified the female voice from these recordings as belonging to QU.

## P. Results of Surveillance at the SUBJECT PREMISES in May, June and July 2009

  44. On or about Tuesday, May 12, 2009, Agents Wally Tsui and Mario Sampedro and I conducted surveillance at the **SUBJECT PREMISES.** We observed the following:

   a. At approximately 5:50 p.m., I observed an Asian man driving a 2007 Toyota Sedan park near the **SUBJECT PREMISES,** exit his vehicle, and enter the **SUBJECT PREMISES.**

   b. At approximately 6:00 p.m., I observed an Asian woman park her red Suzuki wagon and enter the **SUBJECT PREMISES.** Through a check of a law enforcement database, I determined that this vehicle is registered to an address in Huntington Beach, California.[12]

---

  [12] As noted below, during a meeting on July 15, 2009, QU told the UCA that some of the girls who work for her reside in Huntington Beach.

c.    At approximately 6:30 p.m., the other agents and I observed an Asian woman get dropped off in front of and then enter the **SUBJECT PREMISES**.

d.    At approximately 8:10 p.m., the other agents and I observed another Asian woman get dropped off in front of and then enter the **SUBJECT PREMISES**.

45.  On or about Thursday, May 28, 2009, Agents Wally Tsui and Mario Sampedro and I conducted surveillance at the **SUBJECT PREMISES**. We observed the following:

a.    At approximately 7:35 p.m., the other agents and I observed an Asian woman get dropped off in front of and then enter the **SUBJECT PREMISES**.

b.    At approximately 7:55 p.m., the other agents and I observed a black man park his vehicle and then enter the **SUBJECT PREMISES**. The other agents and I observed this man leave the **SUBJECT PREMISES** at approximately 9:30 p.m.

c.    At approximately 9:00 p.m., a newer Mercedes Benz coup, silver in color, parked curbside near the **SUBJECT PREMISES**. I observed a young Asian man exit this vehicle and enter the **SUBJECT PREMISES**. The man left the **SUBJECT PREMISES** at approximately 9:30 p.m.

d.    At approximately 9:10 p.m., a red Suzuki wagon parked curbside near the **SUBJECT PREMISES**. This vehicle was the same vehicle observed during surveillance

at the **SUBJECT PREMISES** on May 12, 2009.  I observed an Asian woman exit the red Suzuki wagon and enter the **SUBJECT PREMISES**.

      e.    At approximately 9:30 p.m., I observed an Asian woman get dropped off in front of and then enter the **SUBJECT PREMISES**.

46.  On or about Friday, June 26, 2009, Special Agents Ted Leyson, Aaron Mogilny, Joshua Akronowitz and Mario Sampedro and I conducted surveillance at the **SUBJECT PREMISES**.  We observed the following:

      a.    At approximately 6:19 p.m., I observed an Infinity sedan park across the street from the **SUBJECT PREMISES**.  I observed an Asian man exit the vehicle and enter the **SUBJECT PREMISES**.  At approximately 7:02 p.m., I observed the Asian man leave the **SUBJECT PREMISES**.

      b.    At approximately 6:35 p.m., I observed a gray Mitsubishi Lancer park across the street from the **SUBJECT PREMISES**.  This is the same vehicle that other agents and I have observed dropping off women at the **SUBJECT PREMISES** during previous surveillances.  On June 26, 2009, I again observed a young Asian woman exit the Mitsubishi Lancer and enter the **SUBJECT PREMISES**.

-31-

c. At approximately 7:00 p.m., I observed the Mitsubishi Lancer return to the **SUBJECT PREMISES** and drop off another Asian woman, who entered the **SUBJECT PREMISES**.

d. At approximately 8:00 p.m., two Asian women left the **SUBJECT PREMISES** and got into a green Honda Civic parked in the driveway of the subject residence. This Honda Civic is registered to **QU** and **ISHIKAWA**. Special Agents Mario Sampedro and Ted Leyson followed the Honda Civic to a nearby restaurant. Agents observed the two women, later identified as **QU** and **ISHIKAWA**, pick up take-out food and return to the **SUBJECT PREMISES**.

47. On or about July 8, 2009, Special Agents Aaron Mogilny, Joshua Akronowitz and Wally Tsui and Group Supervisor Sene Tchen and I conducted surveillance at the **SUBJECT PREMISES**. We observed the following:

a. At approximately 6:35 p.m., an Asian man walked southbound down California Street and entered the **SUBJECT PREMISES**.

b. At approximately 6:45 p.m., I observed three Asian men exit two vehicles and together enter the **SUBJECT PREMISES**.

c. At approximately 7:35 p.m., I observed three Asian women exit from a vehicle and enter the **SUBJECT PREMISES**.

d.    At approximately 7:55 p.m., I observed three
more Asian women exit from another vehicle and enter the
**SUBJECT PREMISES.**

## Q.   The Undercover Agent Purchased One Bottle of Counterfeit VIAGRA® from ISHIKAWA and QU at the SUBJECT PREMISES in July 2009

48.   On July 15, 2009, at approximately 6:00 p.m., the
UCA purchased one bottle of counterfeit VIAGRA® from **TOSHIE
ISHIKAWA** and **QU** at the **SUBJECT PREMISES.**   Through my
conversations with the UCA, I learned the following:

a.    The UCA approached the door of the **SUBJECT
PREMISES** and was greeted by a Chinese woman, later
identified as **TOSHIE ISHIKAWA.   ISHIKAWA** invited the UCA
into the **SUBJECT PREMISES** and introduced herself as
"Sharry."   **ISHIKAWA** told the UCA that she is the younger
sister of "Sophia **QU.**"   **ISHIKAWA** asked the UCA if he would
like something to drink.   The UCA asked for water.
**ISHIKAWA** asked the UCA to sit down on a sofa and went into
the kitchen to get the UCA water.

b.    When **ISHIKAWA** returned from the kitchen, she
was carrying a bottle of water in one hand and a brown
paper bag in the other.   **ISHIKAWA** handed the UCA the bottle
of water along with the brown paper bag, which contained
one bottle of purported VIAGRA® pills.   As **ISHIKAWA** was
handing the brown paper bag to the UCA, she stated, "here

-33-

is the stuff you want." The UCA had not asked or discussed with **ISHIKAWA** the VIAGRA® pills. The UCA had ordered the bottle of VIAGRA® pills from **QU** when he arranged the July 15 meeting with **QU** by telephone on July 14, 2009.

         c.    After receiving the brown paper bag from **ISHIKAWA**, the UCA told **ISHIKAWA** that he wanted to talk to "Sophia." **ISHIKAWA** told the UCA that "Sophia" was upstairs studying on the computer and asked if there was anything with which she could help the UCA. The UCA told **ISHIKAWA** that he was in the process of setting up a meeting with his business partner in Las Vegas, Nevada. While the UCA was discussing the details of this proposed meeting, **ISHIKAWA** interrupted the UCA and told him that he needed ladies (i.e., for the trip to Las Vegas). The UCA stated yes. **ISHIKAWA** stated that customers have to pay for the airfare to fly girls to Las Vegas, and that the girls stay overnight in Las Vegas. **ISHIKAWA** told the UCA that he would have to pay $1,000 per girl, per day for services in Las Vegas.

         d.    During their conversation, **ISHIKAWA** explained to the UCA that it costs $200 to meet a Japanese girl at the **SUBJECT PREMISES** and $250 to take a Japanese girl away from the residence. **ISHIKAWA** told the UCA that a customer needs to call in advance for a Japanese girl

-34-

because the Japanese girls take approximately 45 minutes to drive from Huntington Beach or West Hollywood to the **SUBJECT PREMISES**. **ISHIKAWA** told the UCA that they also have available Chinese, Korean, Thai and Malaysian girls, who live near the **SUBJECT PREMISES**; accordingly, these girls take less time to arrive at the **SUBJECT PREMISES**.

e.   While talking to **ISHIKAWA**, the UCA heard a male voice from the back of the **SUBJECT PREMISES** calling for "Sophia." **ISHIKAWA** responded, "I am coming," and proceeded into the kitchen of the **SUBJECT PREMISES**.  A short time later, **ISHIKAWA** returned from the kitchen and told the UCA that "Sophia" would be done with her online study and would talk to the UCA in another ten minutes or so.   **ISHIKAWA** told the UCA that she lives at the **SUBJECT PREMISES** with "Sophia."

f.   The UCA continued to converse with **ISHIKAWA**. A short time later, **QU** joined **ISHIKAWA** and the UCA in conversation.   The UCA told **QU** that he was thinking of having a business meeting in Las Vegas on August 13, 2009, and inquired whether **QU** could send four or five girls to Las Vegas to meet with the UCA and his business associates. **QU** agreed to send four or five girls from San Gabriel, California to Las Vegas, Nevada, and offered to drive the girls to Las Vegas for a down payment of $2,000.   The UCA

agreed to pay **QU** a down payment of $2,000 on August 10, 2009, for the girls' services in Las Vegas on August 13, 2009.

        g.   **QU** showed the UCA a photo of a young Japanese girl on a laptop computer. **QU** stated that this was a 21-year-old Japanese girl who would travel to Las Vegas to meet the UCA and his business associates on August 13, 2009.

        h.   **QU** told the UCA that girls who work at the **SUBJECT PREMISES** live in the Huntington Beach area of California. **QU** also told the UCA that some of the girls are from Thailand and Malaysia.

        i.   Later, in the presence of **ISHIKAWA**, the UCA paid **QU** $220 for the bottle of purported VIAGRA® pills that **ISHIKAWA** had given to him earlier.

49.  On or about July 20, 2009, I sent to Pfizer's laboratory one sample pill from the bottle that **ISHIKAWA** and **QU** sold to the UCA on July 15, 2009, for scientific analysis.

50.  On or about July 21, 2009, Pfizer's Intellectual Property Forensic Laboratories confirmed that the one representative pill, which **ISHIKAWA** and **QU** had sold to the UCA on July 15, 2009, was counterfeit VIAGRA®.

**R.    QU Agrees to Drive Prostitutes to Las Vegas on August 17, 2009**

51.   On or about August 5, 2009, the UCA called **QU** to change the planned meeting in Las Vegas, Nevada from August 13, 2009, to August 17, 2009.  From my conversations with the UCA, I learned the following:

a.    **QU** agreed to this change in plans and told the UCA that for a down payment of $2,000, **QU** would drive four girls from San Gabriel to Las Vegas on August 17, 2009.

b.    The UCA told **QU** that he would go to **QU's** residence the following week to give **QU** the $2,000 down payment.

**S.    On August 11, 2009, the UCA Gave QU a $2,000 Down Payment and Purchased One Bottle of Suspected Counterfeit VIAGRA®**

52.   On or about August 11, 2009, the UCA met with **QU** at the **SUBJECT PREMISES**.  From my conversations with the UCA following this meeting, I learned the following:

a.    The UCA entered the **SUBJECT PREMISES**.  The UCA gave **QU** a $2,000 down payment for four girls (two Japanese girls, one Chinese girl and one Korean girl) to travel to Las Vegas, Nevada on August 17, 2009.  **QU** told the UCA that the Chinese girl that would go to Las Vegas was named "Shin Shin" and that she was tall, nice and slim.

-37-

QU told the UCA that she has been in this business for 8 years.

b.   QU told the UCA that she would rent a vehicle (most likely a van) to drive the girls to Las Vegas on August 17, 2009.  QU stated that she would try to meet the UCA in Las Vegas at around 2:00 p.m. on August 17, 2009, as the UCA requested.  The UCA told QU to bring the girls to a room at the Mandalay Bay Hotel.

c.   QU sold the UCA one bottle of purported VIAGRA® for $220.  The UCA told QU that he had sold one bottle of VIAGRA® that he had purchased from her previously to a friend for $250.  The UCA told QU that his friend said that the VIAGRA® pills were counterfeit.  The UCA asked QU whether the VIAGRA® she was selling him was counterfeit. QU seemed to be taken aback by this question, but did not deny that the VIAGRA® she was selling to the UCA was counterfeit.  QU stated only that she buys the pills locally.

## T.   Neither QU Nor ISHIKAWA Is a Licensed Medical Doctor or a Licensed Pharmacist

53.   On or about August 13, 2009, I queried the Department of Consumer Affairs' Board of Pharmacy License Search for Registered Pharmacist (http://www.pharmacy.ca.gov/) and learned that no record

-38-

was found under the names **PAMELA QU**, **MINHONG QU**, Sophia Qu, **TOSHIE ISHIKAWA** or Sharry Ishikawa. The California Board of Pharmacy provides open source information about licensed pharmacists and technicians in the State of California. According to this website, California law provides that information on the Board's website can be accepted as verification of a license, pursuant to California Business and Professions Code Section 4106. Because **QU's** and **ISHIKAWA's** names do not appear on the Board of Pharmacy's website, neither **QU** nor **ISHIKAWA** is a licensed pharmacist or technician in California.

54. On or about August 13, 2009, I also queried the Medical Board of California, Department of Consumer Affairs (http://www.medbd.ca.gov/lookup.html) and learned that no record was found under the names **PAMELA QU**, **MINHONG QU**, Sophia Qu, **TOSHIE ISHIKAWA** or Sharry Ishikawa. According to this website, the Medical Board of California is a state government agency that licenses and disciplines medical doctors. The Medical Board provides two principal types of services to consumers: public-record information about California licensed physicians, and investigation of complaints against physicians. Because **QU's** and **ISHIKAWA's** names do not appear on the Medical Board's website, neither **QU** nor **ISHIKAWA** is a licensed physician in California.

## U. Training, Experience and Opinions

55. Based on my training and experience and information relayed to me by other more experienced law enforcement personnel who specialize in the investigation of commercial smuggling, fraud and Intellectual Property Right-related crimes, I know that individuals who sell counterfeit VIAGRA® and other popular pharmaceutical drugs will attempt to conceal the counterfeit nature of the drugs that they distribute. Distributors of counterfeit pharmaceutical drugs typically represent their products to be real products to maximize their profits. Even though counterfeit pharmaceutical drugs are typically sold at lower prices than the corresponding real drugs, distributors of counterfeit drugs derive high profits because of the cheap manufacturing cost of counterfeit drugs. This is because counterfeit pharmaceutical drugs are typically manufactured outside the United States, often in the People's Republic of China, at a very low cost.

56. Based on my training and experience and information relayed to me by other more experienced law enforcement personnel as described above, I know that a vast majority of counterfeit VIAGRA® pills are imported from outside the United States.

57. Based on my training and experience and
information relayed to me by other more experienced law
enforcement personnel as described above, I also know that
legitimate VIAGRA® tablets usually cost between $16 and $20
per tablet at pharmacies and on the Internet. QU and
ISHIKAWA sold the UCA bottles containing 30 pills of
counterfeit VIAGRA® for $230. This price per bottle is
equivalent to a cost of approximately $7.70 per pill, which
is less than half of the lowest price for which a
legitimate VIAGRA® pill usually sells. Furthermore, when
the UCA asked QU on August 11, 2009, whether the pills she
was selling to him were counterfeit, QU appeared to be
taken aback by the UCA's question, but she did not deny
that the pills that she had been selling to the UCA were
counterfeit. Accordingly, based on all the foregoing
information in this affidavit, I submit that probable cause
exists to believe that QU knows that she was selling
counterfeit VIAGRA® pills. Furthermore, given that both QU
and ISHIKAWA have represented that they are sisters, that
they have been residing together since at least 2008, that
ISHIKAWA sold a bottle of purported VIAGRA® pills to the
UCA on July 15, 2009, that ISHIKAWA knew that the UCA was
at the SUBJECT PREMISES to buy purported VIAGRA® pills on
July 15, 2009, without the UCA asking her for those pills,

-41-

and that **ISHIKAWA** knows the details of **QU's** prostitution business, I submit that probable cause exists to believe that **ISHIKAWA** knows about **QU's** business of selling VIAGRA® pills and that **ISHIKAWA** also knows that the pills are counterfeit. For the reasons described above, I believe that **QU** and **ISHIKAWA** deliberately conceal the counterfeit nature of the VIAGRA® pills that they are selling.

58. Based on my training and experience and information relayed to me by other more experienced law enforcement personnel as described above, I know that individuals involved in the illicit counterfeit pharmaceutical drug business usually keep contraband, records, packaging materials, customer lists, records of sales and purchases of their counterfeit pharmaceutical drugs, and ways to camouflage the counterfeit nature of the pills that they are selling, wherever they are conducting their business and in their residences. In this case, **QU** is selling counterfeit VIAGRA® pills from her home, which makes it even more likely that she would keep the foregoing items at the **SUBJECT PREMISES.** Accordingly, based on all the foregoing information in this affidavit, I submit that probable cause exists to believe that evidence, fruits and instrumentalities of counterfeit VIAGRA® sales will be found at the **SUBJECT PREMISES.** In particular, **QU** and

-42-

**ISHIKAWA** likely keep at the **SUBJECT PREMISES** counterfeit VIAGRA® pills, packaging materials, customer lists, records of sales and purchases of counterfeit VIAGRA® pills, and ways to camouflage the counterfeit nature of the pills that they are selling.

59.   Based on my training and experience and information relayed to me by other more experienced law enforcement personnel as described above, I know that individuals involved in the sale of counterfeit pharmaceuticals often use computers to acquire their counterfeit products, including counterfeit VIAGRA® pills. These individuals often also keep records of their counterfeit pharmaceutical drug sales on a computer.  As further discussed above and below, I know that **QU** uses an Internet website and a laptop computer in her prostitution business.   This shows that **QU** is computer savvy, and thus, more likely to also use a computer to make purchases and sales of counterfeit VIAGRA® pills.  Accordingly, based on all the foregoing information in this affidavit, I submit that probable cause exists to believe that evidence, fruits, and instrumentalities of counterfeit VIAGRA® purchases and sales will be found in one or more computer at the **SUBJECT PREMISES.**

-43-

60. Based on my training and experience and information relayed to me by other more experienced law enforcement personnel as described above, I know that individuals involved in a prostitution business keep records, customer lists, and records of their business wherever they are conducting their business and in their residences. In this case, **QU** is running a prostitution business in her home, which makes it even more likely that she would keep the foregoing items at the **SUBJECT PREMISES.** Accordingly, based on all the foregoing information in this affidavit, I submit that probable cause exists to believe that evidence, fruits and instrumentalities of a prostitution business will be found at the **SUBJECT PREMISES.**

61. Based on my training and experience and information relayed to me by other more experienced law enforcement personnel as described above, and the facts in this case, including the fact that **QU** showed the UCA a picture of one of her prostitutes on a laptop computer at the **SUBJECT PREMISES**, I know that **QU** uses a computer and the website www.lafuzoku.com to facilitate, execute and promote her illegal prostitution business. Based on all the foregoing information in this affidavit, I submit that probable cause exists to believe that evidence, fruits, and

-44-

instrumentalities of QU's prostitution business and the
business advertised at www.lafuzoku.com will be found in
one or more computer at the SUBJECT PREMISES.

62. Based on my training and experience and
information relayed to me by other more experienced law
enforcement personnel as described above, I know that
individuals involved in the illicit counterfeit
pharmaceutical drug and prostitution businesses usually
keep large amounts of cash where they conduct their
business and in their residences. In this case, QU is
selling counterfeit VIAGRA® pills and running a
prostitution business in her home, which makes it even more
likely that she would keep large amounts of cash at the
SUBJECT PREMISES. Based on all the foregoing information
in this affidavit, I submit that probable cause exists to
believe that large amounts of cash will be found at the
SUBJECT PREMISES.

63. Based on my training and experience and
information relayed to me by other more experienced law
enforcement personnel as described above, I also know that
individuals who traffic in counterfeit pharmaceutical drugs
typically acquire the drugs, either directly or indirectly,
from outside the United States. Such individuals typically
maintain records relating to the source or sources of their

-45-

contraband. Based on all the foregoing information in this affidavit, I submit that probable cause exists to believe that documents and other records relating to counterfeit pharmaceutical drugs being smuggled or otherwise illegally brought into the Unites States will be found at the **SUBJECT PREMISES.**

64. Based upon my training and experience and information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. I also know that during the search of the premises it is not always possible to search digital devices for data for a number of reasons, including the following:

a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search. In addition, it may also be necessary to consult with specially trained personnel who have specific

expertise in the type of digital device, software
application or operating system that is being searched.

b.    Searching digital devices can require the
use of precise, scientific procedures that are designed to
maintain the integrity of the evidence and to recover
"hidden," erased, compressed, encrypted or password-
protected data.  Digital devices may contain "booby traps"
that destroy or alter data if certain procedures are not
scrupulously followed.  Since digital data is particularly
vulnerable to inadvertent or intentional modification or
destruction, a controlled environment, such as a law
enforcement laboratory, is essential to conducting a
complete and accurate analysis of the digital devices from
which the data will be extracted.

c.    The volume of data stored on many digital
devices will typically be so large that it will be highly
impractical to search for data during the execution of the
physical search of the premises.  A single megabyte of
storage space is the equivalent of 500 double-spaced pages
of text.  A single gigabyte of storage space, or 1,000
megabytes, is the equivalent of 500,000 double-spaced pages
of text.  Storage devices capable of storing 500 gigabytes
(GB) of data are now commonplace in desktop computers.
Consequently, each non-networked, desktop computer found

-47-

during a search can easily contain the equivalent of 240 million pages of data, that, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling. Further, a 500 GB drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.    Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Therefore, a substantial amount of time is necessary to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband or instrumentalities of a crime.

-48-

e.     Based on my knowledge, training and
experience, I know that computer files or remnants of such
files can be recovered months or even years after they have
been downloaded onto a hard drive, deleted or viewed via
the Internet.  Electronic files saved to a hard drive can
be stored for years with little or no cost.  Even when such
files have been deleted, they can be recovered months or
years later using readily-available forensics tools.
Normally, when a person deletes a file on a computer, the
data contained in the file does not actually disappear;
rather, that data remains on the hard drive until it is
overwritten by new data.  Therefore, deleted files, or
remnants of deleted files, may reside in free space or
slack space, i.e., space on the hard drive that is not
allocated to an active file or that is unused after a file
has been allocated to a set block of storage space for long
periods of time before they are overwritten.  In addition,
a computer's operating system may also keep a record of
deleted data in a swap or recovery file.  Similarly, files
that have been viewed via the Internet are automatically
downloaded into a temporary Internet directory or cache.
The browser typically maintains a fixed amount of hard
drive space devoted to these files, and the files are only
overwritten as they are replaced with more recently viewed

-49-

Internet pages.  Thus, the ability to retrieve residue of

an electronic file from a hard drive depends less on when

the file was downloaded or viewed than on a particular

user's operating system, storage capacity, and computer

habits.

## V.

## ITEMS TO BE SEIZED

65.  Based on the foregoing, I respectfully submit

that probable cause exists to believe that evidence,

fruits, and instrumentalities of violations of (1) 18

U.S.C. § 2320 (Trafficking in Counterfeit Goods and

Services); (2) 21 U.S.C. §§ 331(i)(3) and 333(a)(1) (Sale

of Counterfeit Drugs); (3) 21 U.S.C. §§ 331(t),

353(e)(2)(A), and 333(b)(1)(D) (Wholesale Distribution of

Prescription Drugs without a License); (4) 18 U.S.C. § 2421

(Interstate Transportation for Illegal Sexual Activity);

and (5) 18 U.S.C. § 2422 (Coercion and Enticement to Travel

Interstate to Engage in Sexual Activity) will be found at

the **SUBJECT PREMISES**, including, in particular:

a.    Pills, tablets or capsules that resemble or

appear to be the prescription drug VIAGRA®.

b.    Any other pill, tablet or capsule that

appears to be a counterfeit prescription drug.

        c.    Packaging materials related to VIAGRA® or any other counterfeit prescription drug, including, but not limited to, labels, inserts, boxes, bottles, bottle caps, external packaging and blister packs.

        d.    Documents related to the shipment, purchase, sale, distribution, or storage of VIAGRA® or any other counterfeit prescription drug.

        e.    Documents related to receipts, proceeds or profits derived from the sale of VIAGRA® or any other counterfeit prescription drug.

        f.    Documents, including, but not limited to, correspondence, memos and facsimiles, identifying persons involved in the shipment, importation, exportation, purchase, manufacture or sale of VIAGRA® or any other counterfeit prescription drug.

        g.    Documents related to evidence of VIAGRA®, any other prescription drug, or any other counterfeit prescription drug, being smuggled or otherwise illegally brought into the Unites States, including, but not limited to, U.S. Customs entry forms 3461 and 7501, Entry Summaries, U.S. Customs Manifests of Goods, U.S. Customs declaration forms, invoices, bills of lading, air way bills, purchase orders, general ledgers, subsidiary ledgers, packing slips, and air bills.

h.     Documents related to describing or explaining how to sell or distribute any counterfeit prescription drug.

i.     Documents related to the transfer, deposit or concealment of proceeds or profits derived from the sale of VIAGRA® or any counterfeit prescription drug.

j.     Customer lists and address books relating to the sale of VIAGRA® or any counterfeit prescription drug.

k.     Documents relating to transactions involving the sale, distribution or transfer of VIAGRA® or any counterfeit prescription drug.

l.     Documents related to creating, establishing, maintaining, or updating the website www.lafuzuko.com.

m.     Documents related to receipts, proceeds or profits derived from running a prostitution business or the business advertised at www.lafuzuko.com.

n.     Documents related to the transfer, deposit or concealment of proceeds or profits derived from running a prostitution business or the business advertised at www.lafuzuko.com.

o.     Documents related to the hiring, retaining, paying or firing of prostitutes or escorts.

p.     Documents showing or establishing the identity of prostitutes or escorts.

-52-

q.   Documents related to the hiring, retaining, paying or firing of drivers to transport prostitutes or escorts.

r.   Documents showing or establishing the identity of drivers to transport prostitutes or escorts.

s.   Documents related to describing or explaining how to run a prostitution business.

t.   Documents related to advertising for the hiring of prostitutes or escorts.

u.   Documents related to transporting any person across the border of the State of California, or transporting any person in any other interstate travel, for the purpose of engaging in sexual activity.

v.   Customer lists and address books relating to a prostitution business or the business advertised at www.lafuzuko.com.

w.   Condoms, contraceptives and other birth control items relating to a prostitution business.

x.   Documents relating to **TOSHIE ISHIKAWA** entering or remaining in the United States pursuant to an F-1 Student Non-immigrant Visa.

y.   Indicia of occupancy, residency, ownership, or dominion and control of the **SUBJECT PREMISES**, such as leases, utility bills, canceled mail, credit card

-53-

statements, bank account statements, checks, deposit slips, and check books.

z. United States currency greater than $500.

aa. With respect to any digital devices falling within the scope of the foregoing search categories, or any digital devices capable of containing evidence falling within the scope of the foregoing search categories, all records, documents, programs, applications or material that show the actual user(s) of the digital device.

66. As used above, the terms records, documents, programs, applications or materials include records, documents, programs, applications or materials created, modified or stored in any form, including in digital form on any digital device. The term "digital device" includes any electronic device capable of storing and/or processing data in digital form, including: central processing units; laptop or notebook computers; personal digital assistants; wireless communication devices such as telephone paging devices, beepers, and mobile telephones; peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices such as modems, cables, and connections; storage media; and security devices.

-54-

67. In searching for data capable of being read, stored or interpreted by a digital device, law enforcement personnel executing this search warrant will employ the following procedure:

a. Upon securing the premises, the law enforcement personnel executing the search warrant will, to the extent possible without requiring the use of special training in searching and seizing digital data, seek to determine if any digital device contains data falling within the scope of the items to be seized in the warrant. If they can make this determination without jeopardizing the integrity of the digital data and a digital device contains data falling within the scope of the items to be seized in the warrant, that digital device will be seized. If they cannot make this determination, or they believe they cannot make this determination, without jeopardizing the integrity of the digital data, law enforcement personnel trained in searching and seizing digital data (the "computer personnel") will be consulted (either on-site or off-site) to determine whether the digital device can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data contained on the digital device.

b.    If the digital device can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, it will be searched on-site and seized only if the search reveals it to be an item to be seized or to contain any data that falls within the list of items to be seized set forth herein.

c.    If the digital device cannot be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve data, then the digital device will be seized and transported to an appropriate law enforcement laboratory for review.  The digital device will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

d.    In searching the digital device, the computer personnel may examine all of the data contained in the digital device to view their precise contents and determine whether the digital device and/or data falls within the items to be seized as set forth herein.  In addition, the computer personnel may search for and attempt to recover "deleted," "hidden" or encrypted data to determine whether the data falls within the list of items to be seized as set forth herein.

e.    If the computer personnel seize the digital

device pursuant to subparagraph iii above, the computer

personnel will initially search the digital device within a

reasonable amount of time not to exceed 60 days from the

date of execution of the warrant.  If, after conducting

such an initial search, the case agents determine that a

digital device is an item to be seized or contains any data

falling within the list of items to be seized pursuant to

this warrant, the government will retain the digital device

for further analysis; otherwise, the government will return

the digital device.  If the government needs additional

time to determine whether the digital device is an item to

be seized or contains any data falling within the list of

items to be seized pursuant to this warrant, it may seek an

extension of the time period from the Court within the

original sixty day period from the date of execution of the

warrant.

68.    In order to search for data that is capable of

being read or interpreted by a digital device, law

enforcement personnel will need to seize and search the

following items, subject to the procedures set forth above:

a.    Any digital device capable of being used to

commit, further or store evidence of the offense listed

above;

-57-

b.    Any equipment used to facilitate the transmission, creation, display, encoding or storage of digital data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices and optical scanners;

c.    Any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones and personal digital assistants;

d.    Any documentation, operating logs and reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters and other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g. Any passwords, password files, test keys, encryption codes or other information necessary to access the digital device or data stored on the digital device.

## VI.

## CONCLUSIONS

69. Based on the foregoing, I respectfully submit that probable cause exists to believe that **PAMELA QU**, a.k.a. "**MINHONG QU**," a.k.a. "Sophia," and a.k.a. "Sophia Qu," has violated Title 18, United States Code, Section 2320 (Trafficking in Counterfeit Goods and Services), and Title 21, United States Code, Sections 331(i)(3) and 333(a)(1) (Sale of Counterfeit Drugs). Based on the foregoing, I also respectfully submit that probable cause exists to believe that **TOSHIE ISHIKAWA**, a.k.a. "Sharry," and a.k.a. "Sharry Ishikawa," has violated Title 21, United States Code, Sections 331(i)(3) and 333(a)(1) (Sale of Counterfeit Drugs). Accordingly, I respectfully request that criminal complaints against and arrest warrants for **PAMELA QU** and **TOSHIE ISHIKAWA** be issued.

70. Based on the foregoing, I also respectfully submit that probable cause exists to believe that the **SUBJECT PREMISES** contains and will contain evidence, fruits, and instrumentalities of violations of (1) 18 U.S.C. § 2320 (Trafficking in Counterfeit Goods and

Services); (2) 21 U.S.C. §§ 331(i)(3) and 333(a)(1) (Sale of Counterfeit Drugs); (3) 21 U.S.C. §§ 331(t), 353(e)(2)(A), and 333(b)(1)(D) (Wholesale Distribution of Prescription Drugs without a License); (4) 18 U.S.C. § 2421 (Interstate Transportation for Illegal Sexual Activity); and (5) 18 U.S.C. § 2422 (Coercion and Enticement to Travel Interstate to Engage in Sexual Activity). Accordingly, I respectfully request that a search warrant be issued to authorize a search of the residence located at 245 South California Street, San Gabriel, California 91176 (the **SUBJECT PREMISES**).

AARON G. LINDAMAN
Special Agent
United States Immigration and
Customs Enforcement

Subscribed and sworn to before me
this ⎵⎵ day of August, 2009

HONORABLE VICTOR B. KENTON
UNITED STATES MAGISTRATE JUDGE

-60-